**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**KENNETH LEE WEINBERG,**

      **Plaintiff,**

**vs.**                                    **Case No. 4:08cv480-MP/WCS**

**OFFICER ALLEY,
and PAM HODGES,**

      **Defendants.**

_____/


**THIRD REPORT AND RECOMMENDATION**

Plaintiff initiated this case on October 30, 2008, as a *pro se* prisoner.  Doc. 1.
After the discovery period, Defendants filed a motion for summary judgment, doc. 48, on
April 29, 2010.  A report and recommendation was entered, recommending that the
motion for summary judgment be granted as to Defendant Langston.  Doc. 66.  The
recommendation was rejected, doc. 66, and the case was remanded to me on March
16, 2011.  Doc. 68.  A second report and recommendation was entered on March 17,
2011, recommending elimination of time barred claims (prior to October 28, 2004), and
dismissal of the claim against Defendant Langston.  Doc. 69.  That second report and
recommendation was adopted and the case was again remanded.  Doc. 73.

Plaintiff's remaining claims are against Defendants Alley and Hodges in their individual capacities,[1] and concern Plaintiff's allegations that on October 28, 2004, Defendant Alley retaliated against Plaintiff by exposing him and other prisoners to bleach because Plaintiff complained about prior such conduct.  *Id*., at 6.  Plaintiff also claims that Defendant Hodges denied his request for medical care on October 28, 2004.  *Id*., at 9-10.  Plaintiff's claims are, thus, based on the First Amendment (retaliation) and the Eighth Amendment (denial of medical care and cruel and unusual punishment for the use of excessive bleach).  Doc. 18.

Defendants' motion for summary judgment remains pending, doc. 48, and the parties were permitted to file supplemental support in support of, and in opposition to, that motion.  Doc. 74.  Defendants Alley and Hodges filed supplement support of the pending motion for summary judgment, doc. 81.  Plaintiff filed a supplemental response, doc. 82, in opposition to the summary judgment motion.[2]

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If they do so, the burden shifts to Plaintiff to come forward with evidentiary material

---

[1] Plaintiff conceded in his initial response that he cannot maintain official capacity claims "against any named Defendants as a matter of law."  Doc. 61-1, p. 2.

[2] Plaintiff then requested leave to file a response to the Defendants's supplement, doc. 83, which Defendants objected to, doc. 84, and which I denied because Plaintiff had ample time to fully present his version of the events and relevant facts and because good cause was not shown pursuant to N.D. Fla. Loc. R. 7.1.  Doc. 85.  Plaintiff sought a rehearing, doc. 86, and after review, I adhered to the prior order.  Doc. 88.

demonstrating a genuine issue of material fact for trial.  *Id.*  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts.  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Industrial Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano, 129 S.Ct. at 2677.

**Rule 56 evidence**

     **Defendants' evidence, doc. 81**

     During the relevant period of this case, Michael Alley was a correctional officer at the Wakulla County Jail and Lieutenant Pam Hodges was the medical supervisor at the Jail.  Doc. 81, p. 2.  During 2004, the Wakulla County Jail experienced problems with staph infections among prisoners housed in the jail.  Doc. 81, p. 37 (Miller affidavit).

The Wakulla County Health Department advised that a cleaning solution of one part bleach and ten parts water would address the problem.  *Id.*  All cleaning products for the Jail were purchased from companies that supply correctional facilities with cleaning products, and were never bought from a local Ace Hardware store or from any local store.  *Id.*, at 37-38.  Such purchases are made in large quantities to help control costs. *Id.*, at 38.  Chlorine has never been purchased for use in the Jail, nor has chlorine ever been used in the Jail.  *Id.*

Defendant Hodges directed the washing down of all the housing areas at the jail with a cleaning solution to address bacteria issues which resulted in staph infections among inmates at the Jail.  Doc. 81, p. 25 (Alley affidavit).  Defendant Hodges instructed Defendant Alley to dilute the cleaning solution to one part bleach and ten parts water; Defendant Alley did not make the decision as to the manner in which the cleaning solution was diluted.  *Id.*  The bleach used was basic household bleach which Defendant Alley personally mixed and poured into a two-gallon garden sprayer.  *Id.*  A concentrated form of bleach was never sprayed.  *Id.*  Defendant Alley used a measuring cup to ensure the solution was diluted with one part bleach and ten parts water.  *Id.* The garden sprayer was filled only once to clean all the housing cells in the jail.  *Id.* There was only one two-gallon sprayer available for use in cleaning the housing areas of the jail.  *Id.*

While Defendant Alley does not recall the exact dates for cleaning, he does state in his affidavit that "during 2004 until sometime in August, 2005, all of the housing areas in the Wakulla County Jail were cleaned with the diluted cleaning solution three times a week."  Doc. 81, p. 25 (Alley affidavit).  Defendant Alley recalls that "the days in which

[he] supervised jail trustees who assisted in cleaning the house areas were Monday, Wednesday and Friday." *Id.*, at 24-25.  All housing areas were cleaned in the same manner.  *Id.*, at 26.  Defendant Alley personally mixed the cleaning solution with one part bleach and ten parts water and "used the two gallon garden sprayer to spray the tables, shower area and phones in the housing areas."  *Id.*  The inmate "trustees wiped the cleaning solution off the tables and phones afer they had been sprayed."  *Id.*  "The solution sprayed in the shower area was eliminated through the shower drains."  *Id.*

Plaintiff was housed in a large open housing unit with a high ceiling.  *Id.*  "The housing area included tables in the day with housing cells along the perimeter."  *Id.*  "The same cleaning solution was also used in the seven smaller secure confinement cells."  *Id.*  During the time Defendant Alley cleaned the housing areas, no inmate except Plaintiff, ever personally complained to Defendant Alley about the cleaning solution or its effects.  *Id.*  Some inmates actually requested that their personal housing cells be sprayed with the cleaning solution so they could clean their own cells.  *Id.*, at 27.  The trustees who assisted Defendant Alley did not need to wear any type of protective equipment and never complained to Defendant Alley about fumes or effects from the diluted bleach cleaning solution.  *Id.*  Defendant Alley has no personal knowledge of any inmate at the Jail ever declaring a medical emergency or requesting medical care as a result of cleaning with the diluted bleach solution.  *Id.*, at 27-28.

After cleaning, Defendant Alley personally returned the bleach to the storage room in the Jail.  *Id.*, at 27.  Plaintiff Weinberg never had access to the bleach or any other materials which were placed in the storage room of the Jail.  *Id.*  Defendant Alley states that no chlorine or ammonia was ever used to clean the housing areas of the Jail.

*Id.*, at 28.  Defendant Alley has no recollection of any newspaper articles[3] concerning

the cleaning of the Jail, and states that he "did not read the local newspaper," the

Wakulla County News, "on a regular basis."  *Id.*

Defendant Alley states that to the best of his recollection, inmates James Bryan

Ledford and Joseph "Joey" Hicks were the only inmates who assisted him in cleaning

the Jail.  *Id.*, at 27.  Defendant Alley states that Jeffrey Hollis, an inmate who had been

housed at the Wakulla County Jail, did not at any time assist him as a trustee in

cleaning the Jail.  *Id.*  Defendant Alley never accompanied Plaintiff to court appearances

or was present during any of Plaintiff's court appearances.  *Id.*  Defendant Alley states

that "[s]uch activities were not included in [his] duties as a correctional officer working in

the Wakulla County Jail."  *Id.*

Defendant Hodges states in her affidavit that she personally directed Defendant

Mike Alley to supervise the trustees who assisted him in cleaning the housing areas of

the jail with a diluted bleach solution to address staph infections among inmates.  Doc.

81, pp. 29-30 (Hodges affidavit).  During 2004 and 2005, all housing areas "were

sprayed three times a week with a solution of one part bleach to ten parts water."  *Id.*, at

30.  The diluted bleach solution was recommended by the Wakulla County Health

Department to eradicate the bacteria which causes staph infections.  *Id.*  Defendant

Hodges has no reason to believe that the cleaning solution used was not prepared by

Defendant Alley in the manner in which she instructed: one part bleach and ten parts

water.  *Id.*

---

[3] Plaintiff's exhibit 7, submitted with his first response to summary judgment, is a
photocopy of what is purportedly a newspaper article.  Doc. 61-5, p. 13.  The photocopy
of an article is not dated and contains no information as to its source or author.

On October 28, 2004, the Jail was cleaned in the same manner as previously. *Id.* Defendant Hodges recalls that on that date, Plaintiff and two other inmates, one of whom was in a wheelchair, were sitting outside the control room near the booking area. *Id.*, at 31. Defendant Hodges directed to go to that area of the Jail to address Plaintiff Weinberg's complaints about the cleaning of the Jail. *Id.* Plaintiff complained to her about the use of bleach. *Id.* Defendant Hodges specifically recalls that Plaintiff was not having any breathing difficulties and was not in any medical distress. *Id.* Plaintiff did not request or require any medical attention or treatment at that time. *Id.* The two inmates with Plaintiff did not exhibit any distress or need for medical treatment either. *Id.* On October 28, 2004, no complaints were raised by Plaintiff or any other inmate at the Jail of any medical emergencies which required, or even suggested, that medical attention was needed. *Id.* Defendant Hodges never saw Plaintiff or another inmate in any distress related to the cleaning of the Jail on October 28, 2004. *Id.*

Plaintiff's oral complaint to Defendant Hodges on October 28, 2004, did not generate a need for any type of report. *Id.* Defendant Hodges is familiar with Plaintiff and former inmate Jeffery Hollis. *Id.* Defendant Hodges states that inmate Hollis never complained to her about breathing problems or lung problems related to cleaning the Jail with the diluted bleach solution. *Id.* Defendant Hodges advises that beginning in 2001 and continuing throughout his incarceration at the Wakulla County Jail, inmate Hollis was provided with an inhaler to address his asthma, "long before the diluted bleach solution was used to clean the Wakulla County Jail." *Id.*, at 32. Inmate Hollis and Plaintiff were housed in the same pod at the Jail on October 28, 2004, but inmate Hollis never requested medical treatment due to the cleaning of the Jail. *Id.* Two days

after the October 28th cleaning, inmate Hollis requested medical treatment, but it was unrelated to breathing problems or the cleaning.  *Id.*  Inmate Hollis never worked in the medical department as a trustee, but was assigned to take out the trash and clean the floors.  *Id.*

Plaintiff submitted a medical request on October 28, 2004.  *Id.*, at 32-33.  That request was addressed the same day it was submitted.  *Id.*  Plaintiff's request did not include any complaints about breathing difficulties or the cleaning of the Jail on October 28th.[4]  *Id.*, at 33.  Defendant Hodges states in her affidavit that if Plaintiff needed medical treatment due to exposure to the bleach cleaning solution, he could have submitted a medical request and his concerns would have been addressed.  *Id.*  Defendant Hodges has no reason to believe that any medical records at the jail, for former inmate Hollis or Plaintiff, were altered or purged in any manner.  *Id.*

In late August, 2005, a new product, Vanquish, was purchased to replace the diluted bleach solution.  Doc. 81, p. 37 (Miller affidavit).  Vanquish was "an improved solution" that was considered more effective in killing staph infections, and had very little aroma.  *Id.*  It was used for cleaning after August, 2005.  *Id.*

**Plaintiff's Evidence, doc. 82**

Plaintiff states in his response that he "stands on his opposition declaration, including the facts stated and the exhibits presented to the court and defendants, doc. 61, and a supplemental affidavit by Jeffery Hollis in support of Plaintiff [sic] opposition, doc. 64."  Doc. 82, p. 3.  Plaintiff also presents in his supplement the affidavit of Glenn

---

[4] The request stated only that Plaintiff had blood in his urine and he was hurting. Doc. 81, p. 35.

King, who asserts that he was a prisoner in the Wakulla County Jail on October 28, 2004.  Doc. 82, p. 17.

King states that Defendant "Alley had a trustee spraying concentrated chlorine bleach to kill an alleged staph infection rummored [sic] to be in the county jail."  *Id.*  Defendant "Alley overexposed prisoners to the chlorine bleach, which quickly formed a toxic gas."  *Id.*  King states that unidentified prisoners complained to Defendant Alley "that the toxic fumes was causing them medical problems," but Defendant Alley just laughed at them.  *Id.*  King says that they "filed grievances that were never answered."  *Id.*

King testifies in his affidavit that "on October 28, 2004, things got out of hand."  *Id.*  Defendant Alley came into "pod A-3 and was angry at prisoner [Plaintiff] Kenneth Weinberg because the Wakulla County News paper printed a news story on the bleaching."  *Id.*  King reports that Defendant Alley "taped the news paper article to the pod window and came into the pod with a trustee that sprayed several gallons of chlorine bleach on all surfaces."  *Id.*  "When prisoners got sick he took the News paper article down and quickly left the area."  *Id.*  King also reports that Defendant Hodges, the medical supervisor, "responded to the prisoners['] medical emergencies, but refused to treat us."  *Id.*  King says that she "stayed several minutes and left" and King asserts that he suffered "lung damage."  *Id.*  King avers in his affidavit that Defendant "Alley never tried to provide medical assistance or let us go outside."  *Id.*  King adds that the medical supervisor also did not let the prisoners go outside, but the officer in the control room released the prisoners from the pod to go outside.  *Id.*

Plaintiff's version of these events is that the October 28th incident was preceded by applications of chlorine bleach 15 separate times, and that the substance was undiluted chlorine used in swimming pools.  Doc. 82, p. 3.[5]  On October 14, 2004, Plaintiff says that Defendant Alley "overexposed prisoners to concentrated chlorine" and Plaintiff wrote a petitioner which he says was signed by all prisoners in the Wakulla County Jail, pod A-3.  Doc. 61-4, p. 47; doc. 61-5, p. 21.  Plaintiff filed this petition with the clerk of court of the circuit court on October 19, 2004.  Doc. 61-4, pp. 34-46.

Plaintiff avers that the prisoners feared repercussions from jail staff for reporting the matter, and those fears became reality on October 28, 2004.  Doc. 82, p. 3.  Plaintiff said that the Wakulla County newspaper picked up the information about Plaintiff having filed the complaint in the county court and published a news story reporting on that information on or about October 27, 2004.  *Id.*; doc. 61, ex. 7.

It was in the wake of those events that Plaintiff says Defendant Alley arrived in pod A-3 and he "was visibly upset."  Doc. 82, p. 3.  Plaintiff reports that he stopped long enough to tape a copy of the newspaper article to the pod window and had highlighted Plaintiff's name from the article in yellow.  *Id.*  Plaintiff says that Defendant Alley and the inmate trustee "sprayed several gallons of concentrated bleach (swimming pool chlorine).  *Id.*  The trustee sprayed more concentrated bleach on October 28, 2004, than ever before.  *Id.*  Plaintiff asserts this was done maliciously and sadistically to injure Plaintiff and the other 17 prisoners who signed the grievance that was filed in the county clerk's office on or about October 19th.  *Id.*  Plaintiff contends that the actions of

---

[5] Plaintiff's statement of facts in the supplement, doc. 82, are sworn under penalty of perjury as true and correct.  Doc. 82, p. 14.

Defendant Alley on October 28th were done in retaliation for having exposed his

dangerous, wrongful acts of overexposing prisoners to the toxic fumes that quickly

formed after the bleach was sprayed.  *Id.*, p. 4.  Plaintiff states that prisoners were not

relocated to safe areas of the jail or recreation yard during the spraying of the

concentrated bleach.  *Id.*  Plaintiff reports that the lack of adequate ventilation caused

Plaintiff and other prisoners serious health issues.  *Id.*  On October 28th, after using the

bleach, and while Plaintiff and other prisoners were gasping for fresh air, Plaintiff

contends Defendant Alley realized he had seriously injured the prisoners and he

panicked.  *Id.*  Plaintiff reports that Alley took down the newspaper article and left with

the trustee without providing any assistance to the inmates, and leaving them confined

into what Plaintiff described as a gas chamber.  *Id.*  Plaintiff says that when he

attempted to confront Defendant Alley about the dangers of using concentrated bleach

in improperly ventilated areas of the jail, Defendant Alley told Plaintiff that "he did not

care about what happens to the prisoners, he said he did not want to get staph

infection."  *Id.* p. 4.  Plaintiff contends that "Defendant Alley was aware the jail was not

properly ventilated to use concentrated bleach."  *Id.,* p. 5.  The jail pod did not have any

windows that could be opened to get fresh air, and Plaintiff says that "Defendant Alley

failed to relocate prisoners to safe areas before spraying the concentrated bleach."  *Id.*

Plaintiff further stated that on October 28th, he observed a prisoner in a wheelchair,

Milton Williams, who was barely able to breathe.  *Id.*  Plaintiff states that Williams "had

tears running from his eyes."  *Id.*

Plaintiff was transferred to the Leon County Jail and placed in solitary

confinement on October 29, 2004.  *Id.*, p. 6.  When Plaintiff was returned to Wakulla

County Jail in June of 2005, he asserts that Defendant Alley again began retaliating against Plaintiff "by spraying concentrated bleach which had some ammonia mixed with it." *Id.*, p. 6.  Plaintiff states that on June 22, 2005, as he returned from a court hearing, he saw "Defendant Alley leaving his cell with the large pump-up garden sprayer in his hands." *Id.*  Plaintiff said he had to breathe the toxic fumes for several hours before they cleared out. *Id.*  Plaintiff contends his cell was sprayed again on June 23, 2005, and was continued retaliation by Defendant Alley and done maliciously and sadistically to cause Plaintiff injury and suffering. *Id.*, pp. 6-7.

Plaintiff contends that on October 28, 2004, Defendant Hodges was alerted by the control room that prisoners were declaring medical emergencies because of the toxic fumes from the concentrated bleach. *Id.*, p. 7.  Plaintiff said it took Defendant Hodges approximately ten minutes to arrive, and when she came into pod A-3, she saw prisoners gasping for fresh air. *Id.*  Plaintiff said the prisoners were having difficulty breathing, their eyes and skin were burning, and they put wet towels over their faces to stop the burning and help them breathe. *Id.*  Plaintiff said they got dark circles under their eyes so that it appeared they had black eyes, and they suffered lung damage. *Id.* Defendant Hodges said that the fumes were not that bad and she did not see a problem. *Id.,* pp. 7-8.  Plaintiff reports that she quickly left the pod and the prisoners still gasping for air. *Id.*, p. 8.  Plaintiff said that Defendant Hodges denied his request to see a doctor, and also denied his request to see a copy of an incident report about the bleaching of the jail pod A-3. *Id.*, pp. 7-8.

Plaintiff said the control room let the prisoners out to get fresh air on the recreation yard. *Id.*, p. 8.  The prisoners were only allowed to stay outside for one hour

and then forced to return to the pod, even though it took approximately five hours for the toxic fumes to dissipate. *Id.* Plaintiff avers that neither Defendant Alley nor Hodges returned to check on the prisoners' welfare and their actions demonstrated deliberate indifference. *Id.*

Former inmate Jeffrey Hollis also submitted a sworn affidavit. Doc. 64, p. 5 (ex. 1). Hollis states that he was detained at the jail during the relevant period and advised that he was a trustee during most of his detention. *Id.* Hollis said he worked as a cook, laundry man, and "also worked under the direct supervision of [Defendant] Michael Alley on many occasions." *Id.* Hollis also reports that he "worked some in the medical department assisting [Defendant] Hodges." *Id.* Hollis states that the "chlorine bleach used was not household type bleach" but "concentrated chlorine, which was purchase from a local Ace Hardware store that had a large bulk tank, which was stored outside the store for safety." *Id.*, pp. 5-6 on ECF. Hollis said that the product used "was concentrate swimming pool chlorine used to treat swimming pools, and it was highly toxic." *Id.*, p. 6. Hollis reported that it "was pumped into empty 5 gallon plastic buckets." *Id.* Hollis says:

> The chlorine was originally used at the dog pound to disenfect [sic] the dog pens. Officer Alley began to use this same pool chlorine in concentrated form in the unventilated jail pods. I was instructed "not to dilute it with water." Prior to August of 2004, I was instructed to spray the shower areas down with the chlorine, once a week, the toxic fumes quickly formed.

Doc. 64, p. 6. Hollis said that chlorine was "stored in a big warehouse outside the county jail" and claims that on occasions, Hollis helped Defendant Alley "fill the large

pump up garden sprayer." *Id.* Hollis specifically avers that Defendant Alley "would not let [him] add any water to the chlorine." *Id.*

Hollis stated that in August of 2004, a prisoner trustee supervised by Defendant Alley came into the pod and sprayed it with the concentrated chlorine bleach. *Id.*, p. 7. Hollis said several gallons were sprayed and within minutes, "the toxic fumes formed." *Id.* Hollis said prisoners were trying to breath through wet towels and their pillows, but Defendant Alley "thought it was funny and would laugh as he quickly left the jail pod where he could breathe fresh air." *Id.* Hollis said that Defendant Alley ordered the chlorine to be sprayed three to five times a week, and said "[t]he more the prisoners complained, the more often the chlorine was sprayed in pod A-3." *Id.* Hollis contends he "received permanent lung damage from the toxic chlorine fumes." *Id.* Hollis said he was using three different types of inhalers during his stay at the jail, and said he continues to have to use inhalers in prison. *Id.* Hollis reports that when he and Plaintiff and other prisoners "would confront [Defendant] Alley in an effort to get him to dilute the concentrated chlorine," the Defendant "always refused, and would laugh and have the trustee spray more bleach." *Id.*

Hollis states that on October 28, 2004, Defendant Alley stopped outside the pod and taped a newspaper article to the pod window. *Id.* Defendant Alley had highlighted the Plaintiff's name in yellow, and Hollis confirms that the article concerned Plaintiff's having filed a complaint in state court about the use of bleach at the jail. *Id.* Defendant Alley then had the trustee come "in and completely soaked down the pod with more chlorine bleach than ever before." *Id.* Hollis said the prisoners put wet towels on their faces to stop the burning and some inmates fell to the floor. *Id.* When Plaintiff and

other prisoners declared a medical emergency, Defendant Alley removed the newspaper article from the pod window and he and the trustee quickly left.  *Id.*  Hollis said ten to fifteen minutes later, Defendant Hodges came to the pod, but she only stayed about two minutes.  *Id., at 9.*  Hollis said there were "a lot of angry prisoners who were having serious breath problems."  *Id.*  Defendant Hodges said "It's not that bad in here" and left, without providing any treatment.  *Id.*  The control room let the prisoners go outside to get fresh air "for about" an hour, and Hollis said that after returning, the fumes remained for approximately four hours.  *Id.*

**Analysis**

### Eight Amendment claim

Plaintiff was a pretrial detainee at the time of these events.  "The Eleventh Circuit Court of Appeals has held that 'in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the Eighth Amendment to convicted persons.' "  Daniels v. City of Hartford, 645 F.Supp.2d 1036, 1056 (M.D. Ala., 2009), *quoting* Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994) (quoting Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir. 1985)).  Therefore, Plaintiff's Due Process claims are still properly evaluated under the standard for Eighth Amendment claims in the prison context.

"The Eighth Amendment's prohibition against cruel and unusual punishment, applicable to the State of Florida through the Due Process Clause of the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), prohibits the 'unnecessary and wanton infliction of pain,' *Hudson v. McMillian*,

503 U.S. 1, 5, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992)."  Thomas v. Bryant, 614

F.3d 1288, 1303 (11th Cir. 2010).

       In the prison context, there are three distinct Eighth Amendment claims, "each of

which requires a different showing to establish a constitutional violation."  Thomas, 614

F.3d at 1303, citing Danley v. Allen, 540 F.3d 1298, 1306 (11th Cir. 2008), overruled in

part on other grounds, and Randall v. Scott, 610 F.3d 701 (11th Cir. 2010).  The three

separate claims are for "claims challenging specific conditions of confinement, the

excessive use of force, and the deliberate indifference to a prisoner's serious medical

needs." Thomas, 614 F.3d at 1303-04.  Each claim, however, "requires a two-prong

showing: an objective showing of a deprivation or injury that is 'sufficiently serious' to

constitute a denial of the 'minimal civilized measure of life's necessities' and a subjective

showing that the official had a 'sufficiently culpable state of mind.' "  Farmer v. Brennan,

511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994), quoted in Thomas,

614 F.3d at 1304.  "[W]hat is necessary to show sufficient harm and what is necessary

to show a sufficiently culpable state of mind varies with the type of Eighth Amendment

claim at issue."  Hudson, 503 U.S. at 8-9, 112 S.Ct. at 1000, cited in Thomas, 614 F.3d

at 1304.

> The challenged condition must be "extreme."  Id., at 9, 112 S.Ct. at 1000.
> While an inmate "need not await a tragic event" before seeking relief,
> Helling v. McKinney, 509 U.S. 25, 33, 113 S.Ct. 2475, 2481, 125 L.Ed.2d
> 22 (1993), he must at the very least show that a condition of his
> confinement "pose[s] an unreasonable risk of serious damage to his future
> health" or safety, id., at 35, 113 S.Ct. at 2481.  Moreover,  the Eighth
> Amendment requires more than a scientific and statistical inquiry into the
> seriousness of the potential harm and the likelihood that such injury to
> health will actually be caused by exposure to [the challenged condition of
> confinement].  It also requires a court to assess whether society considers
> the risk that the prisoner complains of to be so grave that it violates

contemporary standards of decency to expose anyone unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.  *Id.,* at 36, 113 S.Ct. at 2482.

Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004).

A conditions of confinement case requires a showing of "extreme deprivations" as opposed to "the excessive-force context" in which "contemporary standards of decency may be violated even where no significant injury is evident."  Hudson, at 9–10, 112 S.Ct. at 1000.[6]  "With respect to the subjective inquiry, in both prison conditions and medical needs cases, the relevant state of mind for purposes of liability is deliberate indifference."  Wilson v. Seiter, 501 U.S. 294, 303, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991), *cited in* Thomas, 614 F.3d at 1304.  "Excessive-force claims, however, require a showing of a heightened mental state—that the defendants applied force 'maliciously and sadistically for the very purpose of causing harm.' "  Wilson v. Seiter, 501 U.S. 294, 302, 111 S.Ct. at 2326 (citing Whitley v. Albers, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)), *quoted in* Thomas, 614 F.3d at 1304.

Here, to survive summary judgment on a conditions of confinement Eighth Amendment claim, Plaintiff must demonstrate (1) an objectively extreme deprivation and (2) that the subjective state of mind of the Defendants was deliberately indifferent to that condition of confinement.  Here, Plaintiff has presented evidence that a highly

---

[6] The Supreme Court instructed that "[w]hat is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause depends upon the claim at issue . . ."  Hudson, 112 S.Ct. at 1000 (acknowledging that Eighth Amendment analysis must give "due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged" and citing Whitley, *supra*, 475 U.S., at 320, 106 S.Ct., at 1084.  "For instance, extreme deprivations are required to make out a conditions-of-confinement claim."  Hudson, 112 S.Ct. at 1000.

concentrated form of bleach (pool chlorine) was used, that it was not diluted, that the jail was not properly ventilated, that the prisoners and detainees could not breathe, and the gas vapors were toxic and caused them injury.  Cleaning bleach, such as Clorox, emits strong fumes when not diluted.  Pool bleach, which is quite a bit stronger, probably emits even stronger fumes when undiluted.  The evidence shows that Defendant Alley intentionally used the strongest undiluted bleach.  The evidence shows that Defendants Alley and Hodges intentionally did not provide any relief from the fumes, and it is possible that a jury could determine from their actions, that they were deliberately indifferent to the pain, discomfort, and risk of harm to Plaintiff and the other detainees.[7]

In Hope v. Pelzer, the Court reiterated that in the context of prison conditions, courts "must ascertain whether the officials involved acted with 'deliberate indifference' to the inmates' health or safety."  536 U.S. 730, 737-738, 122 S.Ct. 2508, 2514 (2002), citing Hudson v. McMillian, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).  The subjective state of mind may be inferred when "the risk of harm is obvious."  536 U.S. at 738, 122 S.Ct. at 2514, citing Farmer v. Brennan, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  A jury might conclude, if Plaintiff's evidence were believed, that the detainees at the jail were subjected to an extreme condition in the use of non-diluted concentrated bleach in a non-ventilated area, and that forcing inmates to stay inside and breathe those fumes was painful and presented a risk of harm.  A jury might conclude that notwithstanding the valid penological reason for the cleaning (prevention

---

[7] That the control room permitted the prisoners to go outside and get away from the fumes does not resolve the Defendants' failure to relieve Plaintiff of the conditions of confinement they observed and had the ability to remedy.

of staph infections), the manner in which it was carried out exhibited deliberate indifference to the prisoners' Eighth Amendment rights.

The court on remand, however, analyzed the claim as an excessive force claim. It does not matter which mode of analysis is used, on Plaintiff's evidence, since he has presented a triable issue of material fact as to both kinds of claims. Wilkins v. Gaddy, 130 S.Ct. 1175, 1176-77 (2010), considered the Eighth Amendment in the context of excessive physical force.  In that context, the Court reiterated that prisoners may present a valid Eighth Amendment claim "even when the inmate does not suffer serious injury."  That is so because Hudson, *supra*, directed courts "to decide excessive force claims based on the nature of the force rather than the extent of the injury . . . ." Wilkins, 130 S.Ct. at 1177.  In that context, "[t]he 'core judicial inquiry,' . . . was not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Hudson, 503 U.S. at 7, 112 S.Ct. 995, *quoted in* Wilkins, 130 S.Ct. at 1177.  In the excessive force context, "[w]hen prison officials maliciously and sadistically use force to cause harm," it violates "contemporary standards of decency" regardless of "whether or not significant injury is evident." Wilkins, 130 S.Ct. at 1177.

In this case, Plaintiff has presented evidence that Defendant Alley's actions were done maliciously and sadistically to cause Plaintiff injury and suffering, using strong solutions of bleach than necessary to eradicate the staph bacteria.  Such actions are relevant to determining the sate of mind of the Defendant (the subjective standard), and also whether Plaintiff was subjected to an extreme deprivation in the conditions of

confinement (the objective standard).  Such evidence, if believed, is sufficient to sustain

a claim under the Eighth Amendment.  Of course, Defendants contradict almost every

factual assertion by Plaintiff, but summary judgment cannot be granted with the

disputed evidence in this case.

**Retaliation**

Plaintiff's retaliation claim is solely against Defendant Alley.

"The First Amendment forbids prison officials from retaliating against
prisoners for exercising the right of free speech."  *Farrow v. West*, 320
F.3d 1235, 1248 (11th Cir. 2003).  "It is an established principle of
constitutional law that an inmate is considered to be exercising his First
Amendment right of freedom of speech when he complains to the prison's
administrators about the conditions of his confinement."  *Smith v. Mosley*,
532 F.3d 1270, 1276 (11th Cir. 2008) (citing *Farrow*, 320 F.3d at 1248).

An inmate may maintain a cause of action for retaliation under 42 U.S.C. §
1983 by showing that a prison official's actions were "the result of [the
inmate's] having filed a grievance concerning the conditions of his
imprisonment."  *Farrow*, 320 F.3d at 1248 (quotation marks omitted and
emphasis added).  To establish a First Amendment retaliation claim, a
prisoner need not allege the violation of an additional separate and distinct
constitutional right; instead, the core of the claim is that the prisoner is
being retaliated against for exercising his right to free speech. *Id.*  To
prevail on a retaliation claim, the inmate must establish that: "(1) his
speech was constitutionally protected; (2) the inmate suffered adverse
action such that the [official's] allegedly retaliatory conduct would likely
deter a person of ordinary firmness from engaging in such speech; and (3)
there is a causal relationship between the retaliatory action [the
disciplinary punishment] and the protected speech [the grievance]."
*Mosley*, 532 F.3d at 1276.

O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011).

Again, there is a genuine dispute of material fact.  Plaintiff has shown that he and

other prisoners submitted a petition to the local newspaper complaining of prison

conditions.  Defendant has provided evidence that he was unaware of any complaints

about the use of the bleach, and that he had no recollection of any newspaper articles

concerning the cleaning of the Jail, and said that he "did not read the local newspaper." Plaintiff provided evidence that complaints were presented to Defendant Alley, that he saw the newspaper article, and put it up on the pod window, suggesting that the cleaning on October 28th was done to retaliate against Plaintiff (whose name was highlighted) for having exercised his First Amendment rights to present grievances, to access the courts, and that the cleaning on that day was more excessive and worse than ever before.  While a jail may demonstrate a legitimate need to clean a jail and prevent the spread of highly infectious diseases, it may not use that need as a basis to cause unnecessary harm and cause pain and suffering to inmates under the pretext of merely carrying out a valid goal.  The manner in which the cleaning was done could be viewed by a jury as being retaliatory for exercise of First Amendment rights.  The Defendants' summary judgment motion on this claim should also be denied based on a genuine dispute of material fact.

**Medical Care**

Summary judgment must also be denied as to Plaintiff's claim for medical care from Defendant Hodges.  Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S.

730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), *quoting* <u>Laaman v. Helgemoe</u>, 437 F. Supp. 269, 311 (D. N.H. 1977).

      Plaintiff's evidence is that when Defendant Hodges arrived in the pod, she saw and was aware that Plaintiff and other detainees could not breathe.  An inability to breathe would be obvious to even a lay person.  Plaintiff's evidence is that Defendant Hodges did nothing to assist him or the other prisoners, including doing something as simple as permitting them to go outside and get fresh air.  Plaintiff's evidence is that Defendant Hodges was aware of a serious medical need for Plaintiff and other detainees, but provided no help or medical care, demonstrating deliberate indifference.  Defendant Hodges has disputed those facts and contends that there were no objective signs of any inmate being in distress.  That is a dispute that cannot be resolved on the cold reading of affidavits.  Summary judgment should be denied, and this case set for trial.

**Conclusion**

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motions for summary judgment, docs. 48 and 81, be **DENIED** as Plaintiff has shown there are genuine disputes of material fact on all three claims, and this case should be set for trial.

**IN CHAMBERS** at Tallahassee, Florida, on January 19, 2012.


 S/      William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**